1  WILLIAM A. LEVIN, ESQ.
   wlevin@levinsimes.com
2  LAUREL L. SIMES, ESQ.
   llsimes@levinsimes.com
3  RACHEL B. ABRAMS, ESQ.
   rabrams@levinsimes.com
4  **LEVIN SIMES LLP**
   44 Montgomery Street, 32nd Floor
5  San Francisco, CA  94104
   Telephone: (415) 426-3000
6  Facsimile: (415) 426-3001

7  ADAM MOSKOWITZ, ESQ.
   adam@moskowitz-law.com
8  HOWARD BUSHMAN, ESQ.
   howard@moskowitz-law.com
9  ADAM SCHWARTZBAUM, ESQ.
   adams@moskowitz-law.com
10 **MOSKOWITZ LAW FIRM**
   2 Alhambra Plaza, Suite 601
11 Coral Gables, Florida 33134
   Telephone: (305) 479-7146
12
   WILLIAM F. MERLIN, JR. , ESQ.
13 chip@merlinlawgroup.com
   MICHAEL POLI, ESQ.
14 mpoli@merlinlawgroup.com
   **MERLIN LAW GROUP**
15 1800 Century Park East, Suite 600
   Los Angeles, California 90067
16 Telephone: (310) 229-5961
   Facsimile: (310) 229-5763
17
   ANDREW S. FRIEDMAN, ESQ.
18 afriedman@bffb.com
   **BONNETT, FAIRBOURN, FRIEDMAN & BALINT PC**
19 2325 E Camelback Road
   Suite 300
20 Phoenix, AZ 85016

21 **Attorneys for Plaintiffs**

22              **UNITED STATE DISTRICT COURT**

23            **NORTHERN DISTRICT OF CALIFORNIA**

24 SAGE APTS, LLC. a Wyoming limited liability    )
   company, on behalf of itself and all others    )  Case No.:
25 similarly situated;                            )
                                                  )
26              Plaintiffs,                       )
                                                  )  **CLASS ACTION COMPLAINT**
27        v.                                      )
                                                  )
28 COMMERCIAL INDUSTRIAL BUILDING               )

---

1  OWNER'S ALLIANCE, INC., a California    )  **JURY TRIAL DEMANDED**
   corporation, *dba* CIBA Insurance Services; and )
2  GREAT LAKES INSURANCE SE f/k/a GREAT )
   LAKES REINSURANCE (UK) SE, a German )
3  corporation,                            )
                                           )
4              Defendants.                 )
                                           )
5                                          )
   _____)
6

7      Plaintiff SAGE APTS LLC., on behalf of itself and all others similarly situated (the "Class")

8  brings this class action complaint against (1) Commercial Industrial Building Owner's Alliance d/b/a

9  CIBA Insurance Services ("CIBA") and (2) Great Lakes Insurance SE, formerly known as Great

10 Lakes Reinsurance (UK) SE ("Great Lakes").

11                        **FACTUAL BACKGROUND**

12     1.     This matter arises from an illicit insurance scheme perpetrated by CIBA in California

13 with many of its insurance partners, including Great Lakes, to defraud Plaintiff and property owners

14 from across the country out of tens of millions of dollars in premiums through the sale of illegal

15 insurance coverage. CIBA has orchestrated what is essentially a Ponzi scheme in California through a

16 complex commercial property insurance program (the "CIBA Program" or "Program"). The CIBA

17 Program has enabled CIBA, with the promotion and assistance of multinational insurance carriers such

18 as Great Lakes, to engage in the unauthorized sale of insurance. Through the Program, CIBA has

19 routinely cheated insurance claims so that it can live to survive another day. CIBA and its insurance

20 carrier partners, such as Great Lakes, concealed material facts from Plaintiff and the Class that were

21 necessary to make informed decisions on the risks involved with purchasing commercial property

22 insurance and made various important and material misrepresentations in violation of several

23 California statutes including, *inter alia*, sections 780, 781, 790.02 and 790.03 of the California

24 Insurance Code. Moreover, CIBA and Great Lakes have unlawfully retained, at minimum, tens of

25 millions of dollars in premiums for an insurance program CIBA was not legally authorized to sell.

26     2.     CIBA designed the CIBA Program so that it can illegally engage in the business of

27 insurance in California (and across the country) while avoiding compliance with statutory

28 requirements for insurance carriers and evading scrutiny from state insurance regulators. Only

admitted insurers or qualified surplus line insurers are permitted to engage in the business of insurance. *See* Cal. Ins. Code §§ 680, 700, 703, 1760-1780. CIBA is neither. By not registering as an admitted insurer and/or qualified surplus lines insurer, CIBA has been able and continues to threaten consumers with its unsound financial practices and commercial abuses that insurance laws are specifically enacted to prevent.

3.      Under the guise of acting as a valid Risk Purchasing Group ("RPG"), which is only authorized to purchase and sell commercial liability insurance, CIBA structured a property insurance program consisting of multiple layers of coverage. Although CIBA represented to Plaintiff and the Class that the CIBA Program consists of solely a primary coverage layer and then multiple excess coverage layers from their insurance partners such as Great Lakes, an additional hidden layer of coverage exists below the primary layer – the Self Insured Retention ("SIR") – for which CIBA alone is responsible to pay. Thus, through the SIR, CIBA has and continues to illegally act as an insurance carrier.

4.      CIBA performs all the functions that are reserved solely for licensed insurance carriers, including underwriting, collecting premiums, conducting property inspections, administering and adjusting claims, paying all claims expenses, issuing certificates and evidence of insurance, and, most importantly, assuming risk and indemnity obligations. Despite functioning as an insurer, CIBA has no license to do so and is violating the law while avoiding financial and market examinations and financial solvency requirements that govern licensed insurance carriers and protect consumers.

5.      Without the active and willing participation of well-known and internationally recognized licensed insurance carriers and qualified surplus lines carriers like Great Lakes, the CIBA Program would not and could not exist. These carrier partners enable CIBA to act as an unauthorized insurer by assuming the first layer of risk on all insurance policies issued under the CIBA Program. At best, the participating insurance carriers then delegate to CIBA the authority to perform all the functions of an insurer on their behalf. At worst, the participating insurance carriers perform this delegation without conducting any form of due diligence toward CIBA's authorization to perform the tasks and with knowledge that they are violating the law. Such intentional and/or deliberate indifference to the illegality of the CIBA Program is a violation of both national and international

industry standards and practices.

6.  Thousands of property owners across the United States have unknowingly put their assets and livelihoods at risk by placing their trust in the CIBA Program. Had Plaintiff and the Class known that the CIBA Program was an illicit scheme, they would have purchased property insurance from properly licensed, authorized, and regulated insurance carriers.

7.  CIBA has also lured consumers into purchasing their commercial property insurance through the CIBA Program using false marketing and representations, such as stating low rates for "innovative" and "comprehensive" coverage. That coverage, however, was deceptive. CIBA has insured over $50 billion in property value for all CIBA Program participants, while providing only $1 billion in shared coverage per occurrence for all insureds. Among other material omissions, CIBA failed to disclose to its insureds the true risk associated with purchasing coverage under the CIBA Program: a single catastrophic occurrence could deplete the entire shared limit of available coverage, i.e., property owners could be stuck footing the bill for repairs and replacements despite paying thousands of dollars for insurance coverage. CIBA also concealed from all of its insureds that CIBA assumed the risk for the first $1 million of losses and was therefore the actual, albeit unauthorized, insurance carrier for the most frequent claims.

8.  Plaintiff has retained Christina Urias, former Director of the Arizona Department of Insurance, as an expert in this case. After a careful and thorough review of all of the facts and background materials regarding the activities of CIBA and Great Lakes in this matter, Ms. Urias opines that (1) CIBA is, and has been, acting as an unauthorized insurer in regards to Plaintiff and the proposed class in regards to the CIBA Program; and (2) Great Lakes' involvement with the CIBA Program is in violation of both national and international industry standards and practices. Ms. Urias will explain her opinions and conclusions in more detail as this litigation progresses.

9.  This class action lawsuit is brought on behalf of all consumers who purchased commercial property insurance through the illegal and deceptive CIBA Program. Plaintiff brings representative claims seeking damages and injunctive relief for false advertising and unfair competition under the statutory laws of California. Among other appropriate relief, Plaintiffs seeks to have Defendants disgorge all ill-gotten gains obtained through the illegal CIBA Program.

## **JURISDICTION**

10.     The Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

11.     The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

12.     This Court has jurisdiction over CIBA because it is a closely held California corporation organized under the General Corporation Law of California and has its main corporate office located in Glendale, California. Additionally, it is registered to do business in California and maintains an agent for service of process in California. Accordingly, CIBA's affiliations with California are so continuous and systematic to render it essentially at home in this jurisdiction. Additionally, the Court has jurisdiction over CIBA because Plaintiff's claims arise out of or relate to CIBA's contacts with the forum.

13.     This Court also has jurisdiction over Great Lakes, a German corporation with its registered office in Munich, Germany. Great Lakes is authorized to conduct business in California, is doing business in California, and has registered to do business in California.. Indeed, Great Lakes does significant business in this district and has submitted itself to the jurisdiction of this Court based on its business contacts in California and within this district on numerous occasions. *See e.g.*, *Great Lakes Reinsurance UK PLC v. In & Out Fashion, Inc.*, 2016 WL 3450732 (C.D. Cal.); *Great Lakes Reinsurance (UK) PLC v. Dion*, 2009 WL 5174372 (S.D. Cal.); *Cnty. of Orange v. Great Lakes Reinsurance (UK) PLC*, 2013 WL 12142602 (C.D. Cal.); *Cnty. of Orange v. Great Lakes Reinsurance (UK) PLC*, 2013 WL 12136524 (C.D. Cal.); *City of San Buenaventura v. Great Lakes Reinsurance (UK) PLC*, 2011 WL 13213603 (C.D. Cal.). Great Lakes has sufficient minimum contacts with California and intentionally avails itself of the California consumer market through the marketing and sale of insurance policies and/or services in California. This purposeful availment renders the exercise of jurisdiction by this Court over Great Lakes and its affiliated or related entities permissible under traditional notions of fair play and substantial justice.[1]

---

[1] Discovery in this case will reveal the full extent of CIBA and Great Lakes' contacts and connections within the State of California.

14.    In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiff and the Defendants. 28 U.S.C. § 1332(d)(2). Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated. 28 U.S.C. § 1332(d)(6). This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

15.    Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this district. Venue is also proper in this district pursuant to 18 U.S.C. § 1965(a) because CIBA has an agent in this district and Great Lakes transacts its affairs in this district.

16.    All conditions precedent to this action have occurred, been performed, or have been waived.

## **PARTIES**

**Plaintiff**

17.    Plaintiff SAGE APTS, LLC ("SAGE"), is a limited liability company organized under the laws of the State of Wyoming, where it maintains its offices and conducts its business. UNITED INVESTMENT BROKERS, INC. ("UNITED"), is a S-corporation with its principal offices located in Denver, Colorado. UNITED manages SAGE .

**Defendants**

18.    Defendant Commercial Industrial Building Owner's Alliance d/b/a CIBA Insurance Services is a California corporation with its principal place of business at 655 North Central Avenue, Suite 2100, Glendale, California 91203.

19.    Defendant Great Lakes Insurance SE, formerly known as Great Lakes Reinsurance (UK) SE, is a European company with its principal place of business located in Munich, Germany.[2]

///

_____

[2] Plaintiff reserves the right to amend the complaint to add additional defendants, as discovery may reveal the existence of other insurance carriers who were involved in the CIBA Program. Such carriers may include Everest Indemnity Insurance Company, the company that assumed the primary layer on the policy Plaintiff purchased through the CIBA Insurance Program for the term dated 3/31/2017-3/31/2019.

1

## **FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

2      20.    Since 1993, CIBA has provided commercial property insurance coverage to property

3  owners throughout the country. Over the past ten years, CIBA's operations have expanded rapidly. In

4  2007, the CIBA Program was available in only thirteen states. CIBA now provides commercial

5  property insurance to more than 4,000 property owners in over 8,000 locations throughout the United

6  States. According to the Surplus Lines Association of California, CIBA collected and processed more

7  than $47 million in premiums through the first half of 2015.

8      21.    As stated on its website, CIBA's goal "is to be the industry leader in providing owners

9  and managers of commercial real estate with comprehensive and competitively priced programs for

10  risk coverage and claims management." Corporate Overview and Mission Statement, CIBA

11  SERVICES, http://www.cibaservices.com/ovvmss.php (last visited December 21, 2016).

12      22.    CIBA has two primary lines of insurance business. One line of business includes

13  coverage for industrial and commercial properties, including warehouses, office buildings, and

14  shopping centers (the "Industrial Program"). CIBA's core line of business focuses on residential

15  properties, such as apartment complexes, homeowners associations, and condominiums (the

16  "Residential Program"). Both the Industrial and Residential Programs are comparable or substantially

17  similar programs and are marketed under the umbrella of the CIBA Program.

18      23.    CIBA markets the CIBA Program as providing "unsurpassed" services, including

19  underwriting, inspections and loss control, coverage placement, processing support, sales and

20  marketing support, insurance certificate monitoring, claims administration, legal claims support and

21  subrogation. Claims Adjusting Group, Inc. ("CAG") is a wholly owned subsidiary of CIBA that

22  adjusts and handles property claims for the CIBA Program.

23      24.    The CIBA Program has been referred to as a master layered policy. A master layered

24  policy is a program or policy that creates coverage for multiple entities or properties within a group.

25  Here, the CIBA Program members constitute the group, with CIBA acting as an intermediary between

26  (a) qualified surplus line insurers (and occasionally admitted carriers) who issue insurance policies

27  covering various layers of risk and (b) the property owners who purchase commercial property

28  insurance through the Program. CIBA refers to its insureds as "Members" of its insurance programs.

---

25.    The commercial property insurance policies CIBA issues to its insureds consist of several layers of coverage. Generally, there is a primary layer that is covered by one surplus line carrier. Above that primary coverage layer, various qualified surplus line carriers assume a percentage of the overall risk in one of multiple excess coverage layers of the Program. For example, Great Lakes will assume the risk of the primary layer up to $10 million. The second layer will consist of one or more surplus line carriers who cover losses in excess of $10 million up to an additional $20 million, and so on until the total limit of coverage reaches $1 billion.

26.    The CIBA Program provides coverage on a per occurrence basis, meaning that up to approximately $1 billion in losses will be covered per catastrophe (*e.g.*, hurricane). Thereafter, the limits reset for future losses within the policy term. For each occurrence, all property owners who purchase commercial property insurance from CIBA share the total amount of insurance (*e.g.*, $1 billion per occurrence) available under the CIBA Program.

27.    The purpose of this type of multi-layered insurance is to spread the risk of catastrophic losses. Large multi-layered insurance programs can spread the risk of high catastrophic losses among multiple insurers who would otherwise be unwilling to assume the entire risk alone. Group insurance structures like this, however, are only authorized to purchase and sell commercial liability insurance – not property insurance. Moreover, the CIBA Program runs afoul within the primary layer. Primary layer carriers like Great Lakes only want to assume liability for catastrophic losses, thereby reducing the risk that they will actually have to pay claims, while also avoiding the cost of handling the small, regularly occurring or routine losses, often referred to as "frequency losses." Accordingly, the primary carriers require CIBA to act as an insurer and assume the risk and claim adjustment expenses for the "frequency losses" in amounts up to $1 million per occurrence, subject to annual aggregate limits in the tens of millions of dollars.

**CIBA Illegally Engages in the Business of Insurance**

28.    State statutes define the business of insurance. By way of example, California Insurance Code section 35 defines the transaction of insurance to include solicitation, negotiations preliminary to execution, execution of a contract of insurance, and transaction of matters subsequent to execution of the insurance contract and arising out of it. To protect consumers, states require any entity engaged in

the business of insurance to comply with all statutory requirements. *See* Cal. Ins. Code §§ 699-728.

29.     The CIBA Program is an illicit insurance scheme designed to allow CIBA, with the assistance of surplus lines carriers, and occasionally, licensed insurance carriers, to illegally engage in the business of insurance. In states where the CIBA Program is available, CIBA registers with state insurance regulators as either a surplus lines broker or an RPG.

30.     Even in those states where CIBA is registered as a surplus lines broker, such as California, the CIBA Program purports to operate as an RPG.

31.     RPGs are a product of the federal Liability Risk Retention Act (the "LRRA"). Pursuant to the LRRA, a "purchasing group" is any group with the following characteristics:

(A) has as one of its purposes the purchase of **liability** insurance on a group basis;

(B) purchases such insurance only for its group members and only to cover their similar or related **liability** exposure, as described in subparagraph (C);

(C) is composed of members whose businesses or activities are similar or related with respect to the **liability** to which members are exposed by virtue of any related, similar, or common business, trade, product, services, premises, or operations; and

(D) is domiciled in any State.

15 U.S.C. § 3901(5) (emphasis added). Section 3903 of the LRRA provides RPGs with a limited "safe harbor" by enumerating a list of exemptions from state insurance laws.

32.     The LRRA expressly states that the exemptions provided therein only apply to the purchase or provision of liability insurance:

The exemptions provided under this chapter shall apply only to the provision of liability insurance by a risk retention group or the purchase of liability insurance by a purchasing group, and nothing in this chapter shall be construed to permit the provision or purchase of any other line of insurance by any such group.

15 U.S.C. § 3905(b).

33.     Congress created RPGs in response to the high costs and reduced availability of commercial liability insurance. Insurance industry lobbyists have made numerous attempts to expand the LRRA exemptions to also authorize the sale of commercial property insurance. Each of those attempts has failed — the LRRA exemptions remain limited to the purchase and sale of commercial liability insurance.

34.     Although CIBA offers commercial liability insurance coverage, the CIBA Program predominately provides commercial property insurance to its group members. In fact, Michael Marino, the CEO of CIBA, has admitted that 65% of CIBA's insurance business is providing commercial property insurance coverage. As such, this line of CIBA's insurance business exceeds the scope of the LRRA. Nonetheless, CIBA has never informed state regulators that its primary line of business is commercial property insurance. Thus, to the extent the CIBA Program provides commercial property insurance, it must comply with applicable state laws in order to engage in the business of insurance.

35.     The CIBA Program violates state law because CIBA acts as an insurance carrier without a license to do so. Generally, state laws dictate the statutory requirements to conduct business as an insurance carrier. An entity may apply for a license and receive a certificate of authority to provide insurance coverage (an "Admitted Carrier"). *See, e.g.*, Cal. Ins. Code §§ 699-728 (requirements for a certificate of authority to transact insurance business). Alternatively, an entity may write insurance policies as a non-admitted insurer, or qualified surplus line carrier, when acting through a licensed surplus lines broker ("Qualified Surplus Line Carrier"). *See, e.g.*, Cal. Ins. Code §§ 1760-1780 (requirements for surplus line brokers). CIBA is neither an Admitted Carrier nor a Qualified Surplus Line Carrier in any of the jurisdictions in which it does business.

36.     Nonetheless, CIBA acts an insurance carrier within the hidden SIR layer of the CIBA Program. CIBA fails to disclose in any of its marketing materials, certificates or evidences of insurance, or any other correspondence with its insureds, that CIBA is the insurance carrier for the first tens of millions of dollars in claims annually. This is a critical fact related to the purchase of insurance. Insureds are entirely unaware that an entity that is not subject to any regulatory oversight or any statutory financial solvency requirements is the actual "insurance carrier" for the most frequent and common losses that will occur to their properties.

37.     CIBA, with assistance of insurance carriers like Great Lakes, has gone to great lengths to hide the true nature of the SIR from its insureds and state insurance regulators. Among other deceptive tactics, CIBA has conspired with participating insurance carriers to create "indemnification agreements" and "fronting policies" that disguise CIBA's role as an insurance carrier (the "SIR Agreements"). The SIR Agreements do nothing more than lend the name of a real insurance carrier to

1   the unlawful program. A typical fronting policy states that an insurance carrier, such as Certain

2   Underwriters at Lloyds of London, will provide the insurance coverage for the first $1 million in

3   claims (*i.e.*, the amount of the SIR that CIBA is responsible to pay under the terms of the policy

4   providing coverage for the first layer of the Program). Then, CIBA executes an undisclosed

5   indemnification agreement in favor of the fronting insurance carrier, requiring CIBA to cover 100% of

6   the payments made by the carrier for claims falling within the SIR and delegating to CIBA all of the

7   responsibilities of the insurance carrier in that layer. Through these secret SIR Agreements, CIBA

8   assumes the risk and the loss adjustment expenses for the first layer of losses for all insureds in the

9   CIBA Program, up to an annual aggregate amount in the tens of millions of dollars.

10       38.     The SIR Agreements play a critical role in both the Residential Program and the

11   Industrial Program. In the Residential Program, CIBA makes multi-million dollar wire transfers into

12   the fronting carrier's restricted bank accounts to pay claims falling within the SIR layer before any

13   claims are even submitted by insureds. Similarly, for the Industrial Program, CIBA makes substantial

14   seven-figure payments to the insurance carrier in the primary coverage layer. The insurance carrier

15   then segregates those funds to pay the smaller, non-catastrophic claims as they come in. Any balance

16   of funds in those segregated accounts at the end of the policy or program term is returned to CIBA.

17   When insurance carriers made demands for additional deposits by CIBA, CIBA often does not have

18   sufficient money available to fully fund the requested deposits into the restricted accounts. In some

19   cases, CIBA starts paying the claims directly as a result of insufficient funds to cover the requested

20   deposit.

21       39.     CIBA conceals this core component of the CIBA Program from consumers before they

22   purchase the property insurance and during the entire pendency of the policy coverage. In an effort to

23   maintain the secrecy of this arrangement, CIBA redacts or omits the information regarding the SIR

24   from the "certified" policies and coverage documents it provided to insureds. Whenever insureds

25   request a certified copy of their policy, CIBA ensures that any references to the SIR Agreements are

26   whited-out or deleted before issuing the policy through the mail.

27       40.     CIBA's de facto status as an insurance carrier operating without a license is further

28   highlighted by its questionable underwriting practices. Underwriting is one of the most classic

---

1  functions of all insurance operations. It involves evaluating the risks of insuring a particular person or
2  asset and using the information produced by that evaluation to set premium pricing for insurance
3  policies covering those risks. CIBA has prepared and implemented detailed Underwriting Guidelines
4  setting forth the criteria for which risks CIBA would agree to "write" policies. The Underwriting
5  Guidelines require a CIBA-approved Application Form for all new business "written" by CIBA. These
6  guidelines also require close coordination between CIBA's Underwriting Department and CAG.

7       41.    Moreover, the CIBA Program operates in a Ponzi-like fashion through the CIBA
8  Underwriting Department. As CIBA's underwriters write more insurance policies for properties across
9  the country, the size of CIBA's annual obligation under the SIR rapidly increases. At the same time,
10  CIBA continues to engage additional insurance carriers, like Great Lakes, into the Program. As the
11  CIBA Program expands, CIBA experiences financial pressure to sell more policies and generate more
12  premiums to keep the scheme operational. The premiums CIBA receives from newly written insurance
13  policies are used to fund its SIR obligations under previously written policies. To maintain this
14  scheme, CIBA posts monthly goals on white boards in the Underwriting Department that underwriters
15  are required to meet so CIBA can continue to pay claims within the SIR.

16       42.    In addition, the CIBA Program is not a continual program; rather, it automatically
17  expires every one to three years, depending on the term of the respective Program. This is because the
18  carriers participating in the Program only agree to do so for a period of one to three years (the Program
19  "Term"). At the end of the Program Term, CIBA must effectively reorganize the Program and line up
20  carriers to back or participate in the Program for the following Term. Because some carriers elect not
21  to continue to participate in the Program, the identity of the carriers participating in the Program
22  constantly changes.  This often leaves CIBA scrambling to line up the participating carriers at the
23  expiration of each Program Term. In some instances, CIBA has not lined up carriers for the new Term
24  by the time the expiring Term has ended, resulting in the properties insured under the Program not
25  having any real coverage (other than the coverage provided by CIBA) until all the participating
26  carriers are lined up and under contract. Such "gaps" in coverage between Program Terms have
27  extended for months at a time. This fraudulent conduct violates state, federal, and international
28  standards and practices, including the National Association of Insurance Commissioners ("NAIC")

Model Laws, Regulations and Guidelines, as well as the Principles, Standards and Guidelines of the Insurance Core Principles ("ICP") as established by the International Association of Insurance Supervisors ("IAIS").

43.    These operational issues, combined with the close coordination between the Underwriting Department and CAG, likely influences the CIBA Program's claims handling process to the detriment of its insureds. CIBA's role as an insurance carrier goes beyond just paying claims within the SIR. In addition to claims, CAG also handles all loss adjustment expenses and makes claims paying decisions. Even in states where CAG does not have a license to adjust claims, such as the state of Hawaii, it nonetheless handles the entire claims process.

44.    An additional element demonstrating how CIBA illegally engages in the business of insurance relates to the sharing of risk involved in the CIBA Program. Participants in the Residential Program share a per occurrence limit of coverage for property damage. That limit, which is approximately $1 billion, can be exhausted by a single natural disaster, leaving no coverage for damages sustained to the balance of properties sharing in that coverage. For example, CIBA recently insured properties valued at over $50 billion — a 50 to 1 ratio of insurance sold to insurance provided — representing an insufficient coverage scale to the tune of tens of billions of dollars. In the event of a natural disaster, CIBA is solely responsible for paying all losses above $1 billion; alternatively, its insureds are simply not covered for such losses. For its part, CIBA has routinely struggled to pay just the amount of the SIR and can hardly be expected to cover additional losses in the event of a catastrophe that causes more than $1 billion of damage to its insureds.

45.    In communications with its participating insurance carriers, CIBA contends that the potential for such a "meltdown" scenario is "slim." "Slim" may be an understatement given the damage that natural disasters have caused in the last ten years alone in the United States. For example, in 2005, Hurricane Katrina caused an estimated $48.4 billion in insured property damage. A series of tornados swept through portions of the country in 2011, causing an estimated $7.65 billion in insured property damage. In 2017, Hurricanes Harvey, Irma, and Maria caused over $200 billion in damages. And within the last year, a hailstorm in Texas caused an estimated $3.5 billion in damages. The damages from these single occurrences far exceed the coverage CIBA provides and illustrate the

necessity of insurance regulation, licensure, and financial solvency requirements for all entities engaged in the business of insurance to ensure the fundamental goal of protecting consumers. While the likelihood of such a "meltdown" depends on actuarial analysis, one undisputed fact remains the same — CIBA has never made an adequate disclosure of this risk to its insureds. CIBA's insureds are entitled to this information and should have been made aware of this material risk before purchasing commercial property insurance from CIBA.

46.   Leading insurance experts agree that the CIBA Program is an illicit scheme that enables CIBA to engage in the business of insurance without a license and, in partnership with companies such as Great Lakes, to violate numerous state and international insurance norms. As explained by the former Director of the Arizona Department of Insurance, Christina Urias, in an expert declaration previously prepared for lawsuits challenging the legality of the CIBA Program, CIBA illegally acts as an insurer:

> Every single insurance activity CIBA undertook in these cases were the activities of an insurer — underwriting, property inspections, billing and collection of premiums, adjusting and assuming risk and millions of dollars in indemnity obligations for its members (insureds) losses, adjusting and paying its members (insureds) claims — are all addressed and regulated in Title 20 [of the Arizona Statues] and the LRRA and, for the protection of Arizona consumers, any entity conducting those activities in Arizona must be licensed or authorized to do so.

Urias further described the CIBA Program as an "elaborate pyramid scheme of group property insurance transactions [that] violated industry standards and practices."

45.   Urias was the longest-serving Director of Insurance for the State of Arizona. She has extensive legal and regulatory insurance experience handling insurance litigation matters, working with state legislatures, Congress, the NAIC, the IAIS, state insurance departments, and other governmental entities across the U.S. and abroad. Prior to her public service, Urias was a practicing attorney in Phoenix, Arizona for approximately 15 years, handling insurance litigation and consumer protection matters. Urias concludes that CIBA illegally acts as an insurer. Ms. Urias is an expert retained in this matter and will testify that based upon her experience and the evidence she has already reviewed, both CIBA and Great Lakes continue to violate state and international insurance standards in their conduct described in detail in this Complaint.

46.   Tim Ryles, a former Commissioner of Insurance for the State of Georgia and an

1   Accredited Advisor in Insurance, agrees. In Ryles's expert opinion in prior litigation, the CIBA

2   Program illegally provides property insurance under the guise of acting as an RPG. In an expert report

3   analyzing the CIBA Program, Ryles explains that CIBA's risk-bearing for the first $1 million in claims

4   is an inappropriate function for a purchasing group or surplus lines broker.

5        47.    CIBA was able to accomplish this illicit scheme only with the help of their partner

6   insurance carriers, such as Great Lakes, who are both directly and indirectly responsible for CIBA's

7   illegal conduct.

8                          **Insurance Carriers like Great Lakes**
                      **Enable CIBA to Operate as an Unauthorized Insurer**
9

10       48.    Great Lakes, a wholly-owned subsidiary of Munich Re, is a Surplus Lines Carrier in 49

11  U.S. states, adding "structure/solution," "legality and security," and "efficient and flexible

12  administration" to the transactions in which it is involved. *Business Model*, GREAT LAKES UK,

13  https://www.munichre.com/en/reinsurance/contact/worldwide/europe/united-kingdom/great-lakes-

14  uk/about-us/value-proposition/index.html (last visited December 20, 2016).

15       49.    On its website, Great Lakes touts "effective regulatory management" and "operational

16  excellence":

17       Effective regulatory management:

18       We undertake our business in a regulatory, legal and ethically compliant manner, always
         protecting the interests of Munich Re.
19

20       Operational excellence:

21       We provide operational excellence in our day to day activities and meet the requirements
         of our clients for speed, accuracy, response time, accessibility and expertise.

22  *Our Value Proposition*, GREAT LAKES UK, https://www.munichre.com/en/reinsurance/contact/

23  worldwide/europe/united-kingdom/great-lakes-uk/about-us/value-proposition/index.html (last visited

24  December 20, 2016).

25       50.    Great Lakes participates in the CIBA Program by assuming risk for the primary layer of

26  coverage, as well as taking a percentage of risk in certain excess layers. Insurance carriers who

27  participate in the primary layer of the CIBA Program have conspired with CIBA to implement the SIR

28  Agreements that allow CIBA to illegally engage in the business of insurance. Upon information and

1    belief, Great Lakes has also assisted CIBA in its illicit insurance scheme through the SIR Agreements.

2         51.    CIBA established the SIR at the behest of and in coordination with insurance carriers

3    who provided insurance policies for the primary layer of coverage in the CIBA Program. CIBA has

4    adopted a business model where it covers the vast majority of property damage claims within its $1

5    million SIR, reserving liability for the catastrophic losses to the authorized insurance insurers. A

6    former manager of insurance for CIBA conceded that CIBA takes steps to ensure that the SIR

7    functions in this manner, stating:

8              Each year CIBA analyzes their losses and increases the SIR aggregate to protect our
               insurance carriers. The purpose of the primary and excess policies is for the catastrophic
9              losses, we [CIBA] want to handle the frequency losses within the SIR.

10        52.    As explained above, to implement this scheme, the SIR Agreements are executed to

11   ensure that CIBA handles these "frequency losses" so that the authorized insurance carriers are not

12   faced with those risks. CIBA arranges for premiums to be paid into separate accounts established by

13   the insurance carriers.

14        53.    An additional core aspect of the SIR Agreements involves the insurance carriers

15   outsourcing or delegating their duties and responsibilities to CIBA for all claims that fall within the

16   SIR. The various insurance carrier functions that are delegated to CIBA to be performed on behalf of

17   the CIBA Program insurance carriers contributes to the illegality of the program. Neither the insurance

18   carriers nor CIBA has ever disclosed this material fact to insureds before they purchased property

19   insurance under the CIBA Program.

20        54.    The authorized insurance carriers are also aware that the CIBA Program is illegal

21   because they know an RPG is not authorized to sell commercial property insurance under the LRRA.

22   One former primary layer insurance carrier, Lexington Insurance Company, argued that CIBA was not

23   illegally acting as an insurer because Lexington never did business with an RPG who sold commercial

24   property insurance. Lexington admitted that RPGs could not lawfully sell property insurance under the

25   LRRA. Yet, Lexington had no credible explanation for why it did business with CIBA, a registered

26   RPG who purchased and sold commercial property insurance. Like other insurance carriers in the

27   CIBA Program, Lexington ignored the illegal nature of the CIBA Program to obtain profits at minimal

28   risk. Upon information and belief, Great Lakes facilitated the continued operation of the CIBA scheme

1  by similarly ignoring the illegal structure of the CIBA Program.

2       55.    Insurance carriers have a duty to comply with laws and regulations applicable to the

3  jurisdictions in which they transact business. Great Lakes and other insurance carriers involved with

4  the CIBA Program are parties to the insurance policies CIBA issues to its insureds. As such, by

5  providing property insurance policies to an RPG and entering the SIR Agreements that delegate their

6  insurance carrier duties to CIBA, these insurance carriers violate state insurance law. *See* Cal. Ins.

7  Code §§ 35, 699-728.

8       56.    By participating in the CIBA Program, the insurance carriers also violate industry

9  standards and practices. Insurance experts agree that Lloyds of London's 2011 Market Bulletin

10  "Master Policies & Group Schemes" is representative of the proper industry standards and practices

11  related to group insurance schemes like the CIBA Program. Among other industry practices, the

12  Lloyds Bulletin explains that Qualified Surplus Line Carriers operating in the U.S. must ensure that

13  group schemes comply with all relevant U.S. insurance requirements. Other specific requirements

14  include:

15       •   The insureds must belong to a clearly identifiable group and be connected for a
          reason other than the purchase of the insurance policy.
16

17       •   The group providing the insurance policy must have a legitimate interest other than
          generating a fee.
18
         •   The group providing the insurance should have no discretion as to who can be
19           declared to the policy or as to the premium charged or terms of coverage.

20       •   The group should not produce insurance documentation on behalf of the insurance
          carrier.
21
         •   If the activities of the group could constitute a regulated activity, the insurance
22           carrier should ensure that the group has the necessary regulatory licenses.

23       57.    Great Lakes and other insurance carriers have failed to follow these simple and

24  reasonable industry standards and practices. This is evidenced by the fact that (i) insureds under the

25  CIBA Program are only connected because they are purchasing insurance from CIBA, (ii) CIBA has

26  no legitimate interest in the group other than generating a commission, (iii) CIBA has discretion as to

27  which individuals are included in the CIBA Program and the premiums they are charged, (iv) CIBA

28  issues certificates and evidences of insurance on behalf of Great Lakes and the insurance carriers, and

(v) the CIBA Program is an RPG that unlawfully provides property insurance.

58.    The insurance carriers' role in the CIBA Program also violates the International Core Principles of Insurance ("ICP") promulgated by the IAIS. As the leader of the G-20 countries, the U.S. government endorsed the IAIS as the international insurance standard-setting body. In 2008, the G-20 took action to restore global economic growth and security in the world's financial system, and established the Financial Stability Board ("FSB"). The FSB and the International Monetary Fund ("IMF") both adopted and endorsed the ICP as the insurance standards for insurers across the globe. As leaders at the IAIS, U.S. state insurance regulators participate in the drafting and promulgation of the ICP, and endorse and generally adopt these standards as applicable in the development and enforcement of model insurance laws across the United States.

59.    Certain ICP set standards that are directly related to the CIBA Program's group insurance scheme, including:

- Group wide risks may affect insurance legal entities within a group, while risks at the insurance legal entity level could also affect the group as a whole. To help address this, groups should have strong risk management and compliance culture across the group and the insurance legal entity level. Thus, in addition to meeting group governance requirements, the group should take into account the obligations of its insurance legal entities to comply with local laws and regulations. ICP 8.06.

- Where insurers participate in an insurance group or financial conglomerate, the application of appropriate policies and procedures on conduct of business across the group should result in the fair treatment of customers on a group-wide basis, even if legal provisions in some jurisdictions set requirements that are potentially lower than those used by the group. ICP 19.0.6.

Had insurance carriers like Great Lakes followed these international standards and practices, they would have been aware that their role in endorsing and enabling an RPG to purchase and sell commercial property insurance was harming insureds throughout the country.

60.    ICP 19.1.1 provides that "[t]he concept of due skill, care and diligence implies that insurers and intermediaries should discharge their duties in a way that can reasonably be expected from a prudent person in a like position and under similar circumstances." ICP 19.1.2 further states that "[i]nsurers and intermediaries should have proper policies and procedures in place to achieve this outcome, including taking appropriate measures to ensure that their employees and agents meet high standards of ethics and integrity." Reasonable consumers expect that the parties from whom they

purchase a product have taken steps to ensure the product is legal. Had insurance carriers like Great Lakes taken such steps, the CIBA Program would not have flourished.

61.    According to Ms. Urias:

> In my opinion, [aiding and abetting] liability is invoked when Defendant insurers are exposing consumers to such an opaque commercial property insurance scheme in which a key player – CIBA, an RPG – hides its operations and financial transaction from state regulators, avoids the stringent financial and capital requirements of a licensed insurer and is not a qualified surplus lines insurer, fails to disclose all policy terms, conditions and surplus lines limitations to its group members, assumes indemnity obligations as an "insurer" to its group members under elaborate individual and aggregate deductible provisions hidden under various layers of surplus lines coverage in which it simultaneously sets itself up to be an "insured," even though it does not own a single piece of property being insured under the program.

Thus, the insurance carriers are liable for facilitating the illicit insurance scheme known as the CIBA Program.

**CIBA and Great Lakes Conceal Material Facts from Plaintiff**

62.    Plaintiff owned an apartment complex located in Torrington, Wyoming. Plaintiff initially purchased Basic Property insurance coverage from CIBA through the CIBA Program for the **August 1, 2015 through August 1, 2017** term. Great Lakes was the primary layer insurance carrier during that Program Term, covering losses up to $10 million. CIBA and Great Lakes never disclosed to Plaintiff the risks detailed above prior to its purchase of insurance through the CIBA Program, including the fact that CIBA, not Great Lakes, had assumed the risk for the primary layer of insurance.

63.    Plaintiff renewed its coverage under the CIBA Program for the subsequent term, August 1, 2017 through August 1, 2018. However, Plaintiff cancelled its coverage under the CIBA Program, effective November 30, 2017, due to the poor claims handling experienced by Plaintiff's affiliate company in connection with claims it submitted under the CIBA Program. Between August 1, 2015 and August 1, 2018, Plaintiff paid CIBA tens of thousands of dollars in premiums and assessments for property and liability insurance.

64.    At the times Plaintiff purchased insurance through the CIBA Program and renewed that insurance, Plaintiff was not aware and was not informed by CIBA or Great Lakes that it was purchasing insurance through an illegal group insurance program. Had CIBA or Great Lakes disclosed this fact, Plaintiff would not have purchased insurance through the CIBA Program.

## CLASS ALLEGATIONS

**A.    Class Definition**

65.    Plaintiff brings this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all other persons similarly situated. Plaintiff seeks to represent the following class:

> Nationwide Class:
>
> All consumers who, within the applicable statutes of limitation, purchased commercial property insurance through the CIBA Program from CIBA or its affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees

66.    Plaintiff reserves the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

67.    Defendants subjected Plaintiff and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**B.    Numerosity**

68.    The proposed class is so numerous that joinder of all members would be impracticable. CIBA sold and serviced thousands of commercial property insurance policies throughout the nation. The individual Class members are ascertainable, as the names and addresses of all Class members can be identified in the business records maintained by CIBA. The precise number of Class members for the Class is at least in the hundreds and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually. Plaintiff does not anticipate any difficulties in the management of the action as a class action.

**C.    Commonality**

69.    There are questions of law and fact that are common to Plaintiff's and Class members' claims. These common questions predominate over any questions that go particularly to any individual member of the Class. Among such common questions of law and fact are the following:

a.   Whether CIBA engages in the illegal business of insurance;

b.   Whether the CIBA Program is an illicit Risk Purchasing Group;

c.   Whether CIBA acts an insurance carrier through the Self-Insured Retention by performing all the traditional functions of an authorized insurer;

d.   Whether insurance carriers like Great Lakes had knowledge that CIBA illegally engaged in the business of insurance;

e.   Whether CIBA and insurance carriers like Great Lakes concealed the illegal nature of the CIBA Program;

f.   Whether CIBA and insurance carriers like Great Lakes had a duty to disclose material facts to the Class about the illegal nature of the CIBA Program;

g.   Whether CIBA's and insurance carriers like Great Lakes' omissions regarding the illegal nature of the CIBA Program were likely to deceive the Class;

h.   Whether Defendants have been unjustly enriched at the expense of Plaintiff and the Class members;

i.   Whether Plaintiffs and the Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, or other relief;

j.   The amount and nature of such relief to be awarded to Plaintiff and the Class; and

k.   Whether any applicable statute of limitations should be tolled due to Defendants' concealment of the illegal nature of the CIBA Program.

**D.   Typicality**

70.    Plaintiff is a member of the Class it seeks to represent. Plaintiff's claims are typical of the Class members' claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct. Each Class member has sustained, and will continue to sustain, damages in the same manner as Plaintiff as a result of Defendants' wrongful conduct.

**E.   Adequacy of Representation**

71.    Plaintiff is an adequate representative of the Class it seeks to represent and will fairly and adequately protect the interests of the Class. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel, experienced in litigation of this nature, to represent it. There is no hostility between Plaintiff and the unnamed Class members. Plaintiff anticipates no difficulty in the management of this litigation as a class action.

72.    To prosecute this case, Plaintiff has chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

///

**F.**    **Requirements of Fed. R. Civ. P. 23(b)(3)**

73.    The questions of law or fact common to Plaintiff's and each Class members' claims predominate over any questions of law or fact affecting only individual members of the class. All claims by Plaintiff and the unnamed Class members are based on Defendants' scheme regarding illegal insurance policies and their deceptive and egregious actions involved in securing the illegal insurance policies.

74.    Common issues predominate where, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

75.    As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.**    **Superiority**

76.    A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

(a)    Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;

(b)    Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake. As a result, individual class members have no interest in prosecuting and controlling separate actions;

(c)    There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

(d)    The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

(e)    Individual suits would not be cost effective or economically maintainable as individual actions; and

(f)    The action is manageable as a class action.

**H.**    **Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

77.    Prosecuting separate actions by or against individual Class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

78.     Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

### COUNT I

### Violation of California Business & Professions Code § 17500, *et seq*.
**(Against Defendant CIBA)**

79.     Plaintiff incorporates paragraphs 1 through 78 as though fully set forth herein.

80.     Plaintiff brings this cause of action on behalf of itself and on behalf of the putative class.

81.     The misrepresentations, acts, concealments, and non-disclosures by Defendant CIBA of the material facts detailed above constitute untrue and misleading advertising as defined by Business and Professions Code § 17500, *et seq*.

82.     At all relevant times, Defendant CIBA's advertising and promotion regarding its property insurance program was untrue, incomplete, misleading, and likely to deceive the public and/or has deceived the Plaintiff and all consumers similarly situated, by implicitly representing that CIBA's property insurance program is a legal, properly regulated, insurance program that adequately insures members as promised and advertised.

83.     Beginning at a date presently unknown to Plaintiff, but at least four years prior to the filing of this action, all as set forth above, Defendant CIBA has committed acts of untrue and misleading advertising, as defined by California Business and Professions Code § 17500, *et seq*., by promoting the CIBA property insurance program as a legal insurance program that adequately insures members as promised and advertised, with the intent to directly induce members of the public to enter into contracts for the purchase of CIBA property insurance and to pay tens of millions of dollars a year in premiums toward the CIBA property insurance programs.

84.     In making and disseminating the untrue statements and/or material omissions alleged herein, Defendant CIBA knew, or in the exercise of reasonable care should have known, that the statements and/or omissions were untrue or misleading or incomplete.

85.     Plaintiff and members of the putative class have suffered injury in fact and have lost

money or property as a result of Defendants' untrue and misleading advertising, as more fully set forth herein. Plaintiff and members of the putative class have not received the benefit of their bargain. Plaintiff and members of the putative class have been injured because each paid (and some are still paying) premiums for an illusory insurance scheme.

86.    The acts of untrue and misleading advertising of Defendant CIBA, as described above, present a continuing threat to members of the public in that consumers will continue to enroll in and pay premiums for the CIBA property insurance program under false pretenses.

87.    As a direct and proximate result of the aforementioned acts and representations, Defendant CIBA has received and continues to hold substantial monies rightfully belonging to Plaintiff and members of the putative class, who were induced to enroll in and pay premiums for the CIBA property insurance program under false pretenses.

87.    Unless Defendant CIBA is enjoined from continuing to engage in the untrue and misleading advertising described above, consumers residing within California (and in many other states) will continue to be exposed to and damaged by Defendant CIBA's false advertising.

### COUNT II

#### Violation of California Business & Professions Code § 17200, *et seq.*
(Against Defendant CIBA)

88.    Plaintiff incorporates paragraphs 1 through 78 as though fully set forth herein.

89.    "Unfair competition" is defined in section 17200 of the Business and Professions Code as encompassing any one of five types of business "wrongs," at least three of which are at issue here: (1) an "unfair" business act or practice; (2) an "unlawful" business act or practice; and (3) a "fraudulent" business act or practice. The definitions in section 17200 are disjunctive, meaning that each of the three "wrongs" at issue in this case operates independently from the others.

90.    Plaintiff and Defendant CIBA are each "person[s]" as defined by section 17201 of the California Business and Professions Code. Section 17204 authorizes a private right of action on both an individual and representative basis.

91.    Plaintiff and the putative class reserve the right to allege other violations of law, which constitute other unlawful business practices or acts, as such conduct is ongoing and continues to this

1   date.

**Unfair Prong**

2

3          92.     Defendant CIBA's actions and representations constitute an "unfair" business act or

4   practice under section 17200, in that Defendant's conduct is substantially injurious to consumers,

5   offends public policy, and is immoral, unethical, oppressive, and unscrupulous. Without limitation, it

6   is an unfair business act or practice for Defendant CIBA to negligently and knowingly represent to the

7   consuming public, including Plaintiff, that CIBA's property insurance program legally and adequately

8   insures its members, as fully outlined above, when, in truth and in fact, Defendant CIBA knows that

9   the CIBA property insurance program fails in the material respects outlined above. Defendant CIBA's

10  business practices are also unfair because they offend established public policy and/or are immoral,

11  illegal, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers, in part

12  because consumers are led to believe that the CIBA property insurance program provides legal and

13  authorized insurance that the Program does not actually provide.

14         93.     At a date presently unknown to Plaintiff, but at least four years prior to the filing of this

15  action, all as set forth above, Defendant CIBA committed acts of unfair competition as defined by

16  Business and Professions Code § 17200, *et seq*., by engaging in the false advertising and promotion of

17  the CIBA Program as a one that provides legal and authorized insurance.

18         94.     Plaintiff and the putative class members could not have reasonably avoided the injury

19  suffered by each of them. Plaintiff reserves the right to allege further conduct that constitutes other

20  unfair business acts or practices. Such conduct is ongoing and continues to this date.

21 **Fraudulent Prong**

22         95.     Defendant CIBA's claims and statements and omissions are false, misleading, and/or

23  likely to deceive the consuming public within the meaning of section 17200. Without limitation, it is a

24  fraudulent act or practice for Defendant CIBA to knowingly and/or negligently make false

25  representations to Plaintiff, and to the other members of the putative class, whether orally or in

26  writing, and, in part, do so by intentionally and misleadingly designing the CIBA Program to illegally

27  pool risks, bundle insurance policies, collect premiums, and underinsure policyholders.

28         96.     Plaintiff reserves the right to allege further conduct that constitutes other fraudulent

business acts or practices. Such conduct is ongoing and continues to this date.

97.     The fraudulent, unlawful, and unfair business practices, and false and misleading advertising of Defendant CIBA, as described above, presents a continuing threat to consumers in that they will continue to be misled into paying for and enrolling in the CIBA Program.

**Unlawful Prong**

98.     Defendant CIBA violated the unlawful prong of the UCL because property insurance RPGs that do not qualify as either an admitted carrier or an authorized surplus lines carrier are illegal under California law and are similarly illegal under the insurance laws of the other states where CIBA operates the CIBA Program.

99.     CIBA illegally operates an insurance program under the guise of an RPG, selling tens of millions of dollars a year in commercial property insurance through a Program that pools premiums in exchange for a simultaneously shared "bundle" of insurance policies, with a shared limit of coverage (presently $1 billion per occurrence).

100.     CIBA itself indemnifies insureds under the SIR layer of one or more of the CIBA property insurance programs, further demonstrating that CIBA is illegally engaged in the business of insurance.

101.     In order to legally sell insurance in California, an insurance carrier must be either an "admitted carrier" or an "approved surplus lines carrier." *See* Cal. Ins. Code §§ 699-728, 1760-1780.

102.     CIBA is neither an "admitted carrier" nor an "approved surplus lines carrier" in California, or in any other state in which it sells property insurance.

103.     Further, because Defendant CIBA has violated California False Advertising Law, Business and Professions Code § 17500, *et seq*., Defendant CIBA has also violated California's Unfair Competition Law, Business and Professions Code § 17200 *et seq*., which provides a cause of action for an "unlawful" business act or practice perpetrated on members of the public.

104.     Plaintiff and the putative class reserve the right to allege other violations of law, which constitute other unlawful business practices or acts, as such conduct is ongoing and continues to this date.

105.     As a direct and proximate result of the aforementioned acts and representations of

1   Defendant CIBA, it received and continues to hold substantial monies rightfully belonging to Plaintiff

2   and other similarly situated consumers who were led to enroll in and pay for the CIBA property

3   insurance program, based on the unfair and unlawful acts of Defendant CIBA.

4        106.   Defendant CIBA caused Plaintiff and other members of the putative class to enroll in

5   and pay for the CIBA property insurance program based on false premises during the Class Period as

6   defined herein.

7        107.   Defendants have engaged in unlawful, unfair, and fraudulent business acts or practices,

8   entitling Plaintiff to judgment and equitable relief against Defendants, as set forth in the Prayer for

9   Relief. Pursuant to section 17203 of the Business & Professions Code, as a result of each and every

10  violation of the UCL (which violations are continuing), Plaintiff and the putative class are entitled to

11  restitution from Defendants.

12       108.   Plaintiff and members of the putative Class have suffered injury in fact and have lost

13  money or property as a result of Defendants' unfair competition, as more fully set forth herein.

14  Plaintiff and members of the putative class have been injured in fact because they enrolled in and paid

15  for the CIBA Program.

16       109.   Defendant CIBA, through its acts of unfair competition, has unfairly acquired money

17  from Plaintiff and members of the putative class. It is impossible for the Plaintiff to determine the

18  exact amount of money that Defendant CIBA has obtained without a detailed review of CIBA's books

19  and records. Plaintiff requests that the Court restore this money to Plaintiff and the members of the

20  Class and enjoin Defendant CIBA from continuing to violate the law as described above.

21       110.   Plaintiff seeks an order requiring Defendant CIBA to make full restitution of all

22  moneys wrongfully obtained and to disgorge all ill-gotten revenues and/or profits, together with

23  interest thereon.

24       111.   Unless Defendant CIBA is enjoined from continuing to engage in the unlawful, unfair,

25  fraudulent, untrue, and deceptive business acts and practices described herein, consumers residing

26  within California (and in other states) will continue to be exposed to and damaged by CIBA's unfair

27  acts.

28       112.   Plaintiff seeks an order requiring Defendant CIBA undertake a public information

1    campaign to inform members of the putative class of its prior acts or practices.

2        113.    Plaintiff also seeks attorneys' fees and costs pursuant to, *inter alia*, section 1021.5,

3    California Civil Code, as a result of its enforcement of California insurance and unfair business

4    statutes on behalf of the general public.

5                                          **COUNT III**

6    **Aiding and Abetting Violations of California Business & Professions Code §§ 17200 and 17500**
                                **(Against Defendant Great Lakes)**
7

8        114.    Plaintiff incorporates paragraphs 1 through 78 as though fully set forth herein.

9        115.    As an insurer, Defendant Great Lakes has full knowledge of the extensive regulatory

10   reporting and solvency requirements that must be met to become an insurer in California, as well as

11   full knowledge of national and international insurance industry standards and practices. By virtue of

12   such knowledge, Defendant Great Lakes knew that an RPG is not authorized to sell commercial

13   property insurance under federal law and that the CIBA Program illegally pools risks, bundles

14   insurance policies, collects premiums, and underinsures policyholders. Defendant Great Lakes thus

15   knew that the CIBA Program constitutes an unfair, illegal and fraudulent business act or practice in

16   violation of section 17200, California Business and Professions Code.

17       116.    Defendant Great Lakes also had full knowledge of CIBA's sales efforts in California

18   and other jurisdictions and thus knew that CIBA was promoting the CIBA Program as a legal

19   insurance program that adequately insures members as promised and advertised, thereby engaging in

20   untrue and misleading advertising in violation of section 17500, California Business and Professions

21   Code.

22       117.    Defendant Great Lakes has substantially assisted CIBA's UCL violations by providing

23   property insurance policies to the RPG and, upon information and belief, entering into SIR

24   Agreements through which Great Lakes delegated its insurance carrier duties to CIBA in violation of

25   state insurance law, thereby enabling CIBA to engage in the business of insurance without a license.

26   Defendant Great Lakes failed to conduct any form of due diligence toward CIBA's authorization to

27   perform such tasks, in violation of both national and international industry standards and practices and

28   with knowledge of CIBA's UCL violations, thus giving CIBA a financial incentive to continue to

1   committing UCL violations. Neither Great Lakes nor CIBA disclosed these material facts to insureds

2   before they purchased insurance under the CIBA Program.

3         118.    As a result of Great Lakes' substantial assistance to CIBA in committing the unlawful,

4   unfair and fraudulent business acts or practices in violation of section 17200, California Business and

5   Professions Code, and substantial assistance to CIBA in engaging in unlawful and misleading

6   advertising in violation of section 17500, California Business and Professions Code, Plaintiff and

7   members of the Class have suffered injury in fact, including but not limited to financial losses incurred

8   by payment of premiums for the CIBA Program.

9         119.    Defendant Great Lakes' conduct was a proximate cause of injuries set forth herein

10  incurred by Plaintiff and Class members, and it caused and continues to cause substantial injury to

11  Plaintiff and Class members. By reason of the foregoing, Great Lakes should be required to pay

12  restitution to Plaintiff and members of the Class.

13        120.    Plaintiff is informed and believes, and on that basis alleges, that the unlawful, unfair

14  and fraudulent business acts or practices and the untrue and misleading advertising alleged above are

15  continuing in nature and are widespread practices engaged in by Defendants.

16        121.    Plaintiff did not discover facts constituting the violations alleged herein until

17  recently.Defendants engaged in fraudulent concealment, affirmative acts and misrepresentations that

18  concealed, prevented and dissuaded Plaintiff from gaining knowledge of the facts constituting the

19  violations alleged herein**.**

20        122.    Plaintiff and class members seek injunctive relief against Defendants temporarily,

21  preliminarily, and permanently enjoining Defendants from continuing to engage in the unlawful, unfair

22  and fraudulent business acts or practices and the untrue and misleading advertising alleged above and

23  preventing Defendants from collecting insurance premiums in connection with the CIBA Program.

24        123.    Pursuant to sections 17203 and 17535, California Business and Professions Code,

25  Plaintiff seeks an order requiring Defendants to immediately and permanently cease such acts of

26  unlawful, unfair and fraudulent business acts or practices and the untrue and misleading advertising

27  and requiring Defendants to return the full amount of money wrongfully required, obtained and

28  collected as the result of Defendants' UCL violations. Pursuant to section 1021.5, California Civil

Code, Plaintiff and the Class respectfully request an award of attorneys' fees as the prevailing party in their request for injunctive relief and restitutionary relief.

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of themselves and all similarly situated individuals, demands judgment against Defendants as follows:

(a)      Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiff and their counsel to be representatives of the Class;

(b)      Enjoining Defendants from continuing the acts and practices described above;

(c)      Awarding Plaintiff and the Class costs and disbursements and reasonable allowances for the fees of Plaintiff's and the Class's counsel and experts, and reimbursement of expenses;

(d)      Awarding such other and further relief the Court deems just and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 4th day of April, 2018.

WILLIAM A. LEVIN
wlevin@levinsimes.com
LAUREL L. SIMES
llsimes@levinsimes.com
RACHEL B. ABRAMS
rabrams@levinsimes.
**LEVIN SIMES**
44 Montgomery Street, 32nd Floor
San Francisco, CA 94104
Telephone: (310) 229-5961
Facsimile: (310) 229-5763

/s/ William A. Levin
     William A. Levin

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ADAM MOSKOWITZ
adam@moskowitz-law.com
HOWARD BUSHMAN
howard@moskowitz-law.com
ADAM SCHWARTZBAUM
adams@moskowitz-law.com
**MOSKOWITZ LAW FIRM**
2 Alhambra Plaza, Suite 601
Coral Gables, Florida 33134
Telephone: (305) 479-7146
*Subject to admission Pro Hac Vice*

WILLIAM F. MERLIN, JR.
chip@merlinlawgroup.com
MICHAEL POLI
mpoli@merlinlawgroup.com
**MERLIN LAW GROUP**
1800 Century Park East, Suite 600
Los Angeles, California 90067
Telephone: (310) 229-5961
Facsimile: (310) 229-5763
*Subject to admission Pro Hac Vice*

ANDREW S. FRIEDMAN
afriedman@bffb.com
**BONNETT, FAIRBOURN, FRIEDMAN & BALINT PC**
2325 E Camelback Road
Suite 300
Phoenix, AZ 85016
Telephone: (602) 274-1100
Facsimile: (602) 274-1199
*Subject to admission Pro Hac Vice*

*Counsel for Plaintiff, Sage Apts, LLC*

CLASS ACTION COMPLAINT